IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                         No.  CR-03-0083 MV

MALINDA BLANCO,

        Defendant.


**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Malinda Blanco's Motion to Suppress Evidence [**Doc. No. 20**].  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well-taken and will be **DENIED**.


**BACKGROUND**

In February 2002, Matrix Capital Bank (Matrix) initiated foreclosure proceedings against Defendant Malinda Blanco for failure to make mortgage payments for her home at 5612 Equestrian Drive in Albuquerque, New Mexico.  On May 29, 2002, a default judgment was entered against Ms. Blanco in Albuquerque District Court, and judicial sale of her home was ordered.  A certificate of mailing of the default judgment and notice of sale also was filed on this date.  On September 25, 2002, a Notice of Demand to Vacate Premises was served on Ms. Blanco's boyfriend who also lived at that address.  Although the notice stated that the house was to be vacated within three days, Ms. Blanco continued to live in the residence.

On November 14, 2002, Matrix obtained a writ of assistance from Second Judicial District Judge Theresa Baca to effectuate the eviction of Ms. Blanco.  The writ stated that it was to be returned to Judge Baca within ten (10) days.

On December 19, 2002, at approximately 9:30 a.m., Bernalillo County Sheriff's Department Deputies William Lucero and Miguel Amaro accompanied Robbie Sanchez, an agent of Matrix, and two employees of Mr. Sanchez, to Ms. Blanco's home to aid in the eviction, pursuant to the writ of assistance.  Before the officers or Mr. Sanchez and his employees proceeded to serve any papers on Ms. Blanco, an undercover Albuquerque police officer who was coincidentally in the neighborhood, approached the deputies.  The police officer informed Deputy Lucero that Ms. Blanco's home was known for drug activity and that, at that location, police previously had discovered a car in which methamphetamine was being cooked.  After the officer left, the deputies knocked on Ms. Blanco's door, Ms. Blanco answered, and the deputies identified themselves, stating they needed to serve a court order.  The deputies could hear dogs barking aggressively from within the home and asked Ms. Blanco to secure the dogs before they continued.  Ms. Blanco went back into the home, closing the door behind her, while the deputies waited outside.  After ten or fifteen minutes had elapsed, she returned to the door without the dogs.  The deputies repeated that she needed to secure the dogs, at which time Ms. Blanco closed the door again and returned with two dogs.  She placed the dogs in a green truck parked outside, went back in the home and retrieved another smaller dog that she placed in a white vehicle parked in front of the garage.

Lucero then informed Ms. Blanco the deputies were there to execute a writ of assistance and that she was being evicted from her home immediately.  The deputies advised Ms. Blanco that

they would be accompanying representatives of the securing company as they completed an inventory of the home and changed the locks on the doors.  When the deputies asked Ms. Blanco if anyone else was in the home, she said no.  Deputy Lucero then requested Ms. Blanco exit the home and wait across the street, for safety and security reasons, while the officers checked the home before Mr. Sanchez and his employees commenced their work.  Ms. Blanco complied and waited outside.

The deputies drew their weapons and loudly announced their presence before entering. Once in the home, they moved from room to room and checked the backyard and the garage, looking for any people that might have been hiding.  The deputies noticed that the interior of the home was in massive disarray.  In addition to the general mess, the officers noticed an unusually large number of electronics (including hobby planes and remote control vehicles), a motorcycle with tools nearby in the living room, a surveillance system and computer equipment scattered in various rooms.  As a result of their observations and the undercover police officer's comments, they requested the Sheriff's Department send over additional personnel, someone with "investigative skills."[1]

Having completed the protective sweep and finding no apparent danger, the deputies permitted Mr. Sanchez and his employees to begin their inventory of the home, take pictures and

---

[1]Both deputies stated they did not see any firearms during this sweep of the house. Deputy Amaro testified at the suppression hearing that he observed a small, plastic dosage cup with white residue atop a large gun-safe in the walk-in closet of the master bedroom; that, based on the cup's appearance alone, he suspected the powder to be some narcotic substance; and that he conveyed his suspicions to Lucero before Lucero called for backup.  However, this testimony is not credible.  Deputy Lucero testified that the two officers found no evidence of drugs during the sweep, and Amaro's own report written following the search states that the dosage cup was found *after* the initial sweep of the house had been completed.

change the locks, while they waited for additional officers to arrive. Ms. Blanco was permitted to return to the home twice during this period as well. She first returned to use the restroom and then reentered again later to retrieve various personal items. Both times, she entered with permission of the deputies and was followed by Deputy Amaro, who monitored her activity. When Ms. Blanco was retrieving personal items from the master bedroom, Amaro saw a closed pistol case lying on the bed, but no weapon.

At around 10:30a.m., Detective Bill Webb, who worked mostly on auto theft cases but also in stolen property investigations as part of the Sheriff's Department Property Division, arrived at the scene. When he had received the call for assistance from the deputies' supervisor Sergeant McGinley, Detective Webb was told that the deputies were suspicious because they had found a motorcycle in the living room of the house, another in the garage, and a "large amount of property in the home, a lot of radio-controlled toys, and games and things like that." Upon arriving, Deputy Lucero met Detective Webb in the front yard, recounting the items that they had seen in the home. At the suppression hearing, Defendant Webb testified that when he first stepped into the house, he smelled a "strong -- or moderate chemical odor."

Webb entered the house and noticed the motorcycle in the living room, along with a large assortment of electronic equipment (including fifty to seventy-five electronic or remote-controlled toys) and sports paraphernalia (such as sports trading cards, football helmets) scattered everywhere. To inspect the motorcycle more closely, Webb moved a cable to get a look at its vehicle identification number (VIN). After writing down the VIN, he entered the garage. Upon seeing another motorcycle there, he approached the vehicle and moved a cable to take down its VIN. Detective Webb's attention then moved to a large amount of chemical staining on the wall

of the garage which he testified he thought was consistent with stains he had seen at other crime scenes where methamphetamine had been manufactured.[2]  When Detective Webb reentered the house from the garage, Deputy Amaro directed him toward the master bathroom, in which they observed tubing, chemical containers, additional staining and, according to Webb, detected "a strong chemical odor."  At this time, Detective Webb decided they needed to call "someone that was more experienced, a narcotics agent, to have a look at the place."

As Webb exited the bathroom and passed through the master bedroom, he noticed a gun-safe in the walk-in closet and, on top of the safe, a small dosage cup.  Detective Webb noticed white residue in the cup and, based on his visual observation of the powder alone, identified it as methamphetamine.  At some point after seeing the dosage cup, Webb obtained a drug test kit from one of Sergeant McGinley's officers and determined that the powder was methamphetamine. When Webb headed to the front of the house to call for additional officers, he was notified by Sergeant McGinley that narcotics investigators already had been called.

While waiting for the narcotics officers to arrive, Webb ran the motorcycles' VINs in the FBI's National Crime Information Center (NCIC) database.  One of the motorcycles was registered to a business and the other to Ms. Blanco and an individual named Eddie Lando.

Detective Webb testified that also during this time, an Albuquerque police officer arrived in a marked car and spoke to him and Sergeant McGinley.  The officer informed them that a

---

[2]Detective Webb explained that, prior to working in the property division, he had spent four years in the Sheriff's Department crime scenes unit, where he assisted the "narcotics unit in the execution of search warrants at methamphetamine labs and narcotics labs, [and thus] had experience in dealing with those things."

search warrant "had possibly been executed at the residence less than a month before in reference to a meth lab."

Thereafter, Detective Webb reentered the home and was looking at the electronic equipment and toys in the living room when Deputy Amaro called him into the master bedroom. Apparently, some time after Detective Webb had first arrived and after Ms. Blanco had retrieved her personal belongings, Deputy Amaro had gone back to the master bedroom and opened the closed pistol case he had seen while Ms. Blanco was packing. After determining the weapon was loaded, he then proceeded to open a drawer which he had seen Ms. Blanco open while packing. Deputy Amaro testified that although he had not been able to see the contents of the drawer when Ms. Blanco had opened it, he then saw three handguns in the drawer. He removed the handguns, placed them on the bed and called Detective Webb to the room. Webb took down the serial numbers and then went to his vehicle to run them through the NCIC database using his mobile computer.

Shortly before noon, DEA Agent Frank Chavez arrived in response to the call for narcotics investigators. Agent Chavez testified that, upon arrival, Webb informed him that an Albuquerque Police Department detective had stated there was a "possible methamphetamine lab taken from that residence a few weeks prior," "that there was a small amount of methamphetamine -- or white powder that had field tested positive for methamphetamine and was found inside the master bedroom closet, that there was some tubing inside ... [the] master bathroom." Agent Chavez then proceeded to walk through the house. According to Detective Webb's testimony, during this walk-through, Agent Chavez asked Webb who owned the motorcycle, and Webb told him that one was registered to Malinda Blanco and Eddie Lando.

According to Detective Webb's report, Chavez immediately recognized Lando's name as one a confidential informant had previously identified as belonging to a methamphetamine manufacturer.[3]

While walking through the home, Agent Chavez detected a "light chemical odor" consistent with the manufacture of methamphetamine and noticed the chemical staining in various locations.  In light of his observations and the information provided to him by the officers who had searched the house prior to his arrival, Agent Chavez decided to speak with Ms. Blanco to "get any other information, or find out if there [were] any other hidden hazards or if there [were] chemicals boxed up somewheres [sic]."  He initially approached her outside the home, but then moved into the den area, advised her of her *Miranda* rights and proceeded to ask questions. When he asked her whether anyone else lived in the home, Ms. Blanco responded that Eddie also lived there.  According to Agent Chavez's testimony, it was at this point that he connected Eddie, Ms. Blanco and the house with his confidential informant's tip.  Once Ms. Blanco indicated that Eddie was not in the home, Agent Chavez spoke with Detective Webb separately and asked Ms. Blanco to exit the home.

The tip previously given to Agent Chavez included a description of a "safe room" located somewhere in the kitchen area.  Agent Chavez took Detective Webb with him into the kitchen. Seeing that the ceiling light was pulled down slightly, he told Webb that there was possibly a safe house above the kitchen and that Eddie might be hiding there.  Detective Webb indicated that neither he nor any of the other officers had noticed the ceiling.  Chavez then asked Webb to check

---

[3]At the suppression hearing, Agent Chavez denied having asked Webb about the ownership of the motorcycles and stated he could not remember whether Webb mentioned Eddie's name to him and, if he had, at what time.

the area, and Webb proceeded to pull down stairs concealed above the light fixture leading to the attic. Webb climbed the stairs and confirmed that no individuals were hidden there. Webb also stated that there was equipment used to make methamphetamine in the attic, which Agent Chavez went up to examine, along with another officer who also was present. Verifying that the lab was not in operation, Chavez and the officer descended the stairs, asked everyone to clear out of the home and then called the U.S. Attorney's Office to obtain a federal search warrant for the home.

At around 1:30p.m., DEA Task Force Officers Mark Putnam and Joey Rodriguez arrived, along with Agent Chavez's supervisor, Chris Watson. Agent Chavez walked Officer Putnam through the house, who took notes to prepare for the search warrant application. After, all the officers exited the home and waited outside until the warrant was obtained, at roughly 5:00p.m. At that time, the methamphetamine lab was disassembled, and additional evidence was taken from the house.

On March 17, 2003, Defendant filed a motion to suppress **[Doc. No. 20]** all evidence seized from the residence. First, Defendant contends that the writ of assistance was invalid and could not have authorized the deputies' entry because it was served several weeks after having been issued even though Judge Baca had ordered return of the writ in ten days. Moreover, even assuming the writ was valid, Defendant argues it permitted only a protective sweep of the home and the deputies' conduct amounted to a far more expansive and unauthorized, general search. In addition, Defendant argues that the officers' warrantless search and seizure of items in the home

was not justified by exigent circumstances.[4]  The government filed a response on April 7, 2003
[**Doc. No. 26**], arguing that Ms. Blanco does not have standing[5] to raise a Fourth Amendment
claim because eviction proceedings against her already had been commenced.  The Government
also argued that the seizures were the result of lawful plain view searches and that the evidence
would have been discovered inevitably.

The Court held a hearing on the motion on April 24, 2003, at which time it ruled that Ms.
Blanco did have the requisite interest in the premises to raise a Fourth Amendment challenge to
the search, but took the motion under advisement.  The parties filed supplemental briefs after the
hearing, with the government filing its additional briefs on May 19, 2003 [**Doc. Nos. 34 & 35**],
and Defendant filing a response on June 2, 2003 [**Doc. No. 36**].

## DISCUSSION

### A.        Standing

The Court ruled at the suppression hearing that Ms. Blanco has standing to raise a Fourth
Amendment challenge to the search of the house; however, upon further review, the Court finds
that Ms. Blanco does not have a sufficient interest under relevant law.

---

[4]Defendant also states that she did not consent to the search, and the government does not
dispute this claim.

[5]Although the Supreme Court ruled in *Rakas v Illinois*, 438 U.S. 128 (1979), that the
issue of whether a person had a sufficient interest in the premises searched to raise a Fourth
Amendment challenge to the search is "more properly placed within the purview of substantive
Fourth Amendment law than within that of standing," *id.* at 140, the term "standing" continues to
be used when discussing this preliminary analysis.

Although the Supreme Court initially stated that "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress" *Jones v. United States*, 362 U.S. 257, 267 (1960), it later acknowledged that this formulation was "too broad a gauge for measurement of Fourth Amendment rights," *Rakas v. Illinois*, 439 U.S. 128, 142 (1978). The Court explained that whether a defendant was legitimately on the premises is not the controlling inquiry, *id.* at 148, since "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place," *id.* at 143. A defendant's claimed subjective expectation of privacy is legitimate if it is "one that society is prepared to recognize as reasonable." *Id.* at 143-44, n.12 (quotations omitted); *see also Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

In the case at bar, the Government argues that, assuming Ms. Blanco had a subjective expectation of privacy in her home, that expectation was objectively unreasonable because she had been informed that eviction proceedings against her had been initiated. The Fovernment stresses that "the legal effect of the eviction was to divest defendant of a possessory interest in her former home and transfer it to the Bank." (Govt's Resp. at 4-5.) As such, the Government contends that Ms. Blanco's eviction presents a situation similar to those "in which an individual overstays a reservation in a hotel and then claims a privacy interest in the personal property remaining in the room." (Govt's Resp. at 6.)

As for the first claim, the Court notes that state property law, while significant, does not by itself determine whether Fourth Amendment interests are implicated. In *Rakas*, the Supreme Court took care to affirm the view of prior decisions that "arcane distinctions developed in

-10-

property and tort law between guests, licensees, invitees, and the like, ought not to control" the question of whether a person's interest in a place is sufficient to trigger the Fourth Amendment's protections against unreasonable government intrusion.  *Rakas*, 439 U.S. at 143.  The rule reiterated in *Rakas* and applied in subsequent cases, *e.g., Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990), has made clear that the Fourth Amendment's safeguards may be implicated even if an individual is not in her own home, so long as she possesses an adequate interest.

Consistent with this principle, even in the line of cases cited by the Government involving holdover hotel guests, courts have noted that an individual may have an objectively reasonable expectation of privacy in a room, even though the rental period has formally expired.  In *United States v. Owens*, 782 F.2d 146 (10th Cir. 1986), for example, the Tenth Circuit concluded the defendant could bring a Fourth Amendment challenge to the search of his motel room because he previously had stayed in the room past the usual checkout time and been allowed to continue his stay by paying a fee after that time.  The Tenth Circuit found that based on his prior conduct and the motel's prior practice of extending his stay without consequence, the defendant's expectation of privacy in his room was "eminently reasonable."  *Id.* at 150; *accord United States v. Dorais*, 241 F.3d 1124, 1129 (9th Cir. 2001) (holding that "policies and practices of a hotel may result in the extension past checkout time of a defendant's reasonable expectation of privacy" even though general rule is that expectation expires at checkout time).

However, the facts presently before the Court are distinguishable from *Owens* and similar cases.  Ms. Blanco testified that she was the sole owner of and had been residing in the home at 5612 Equestrian since approximately 1995.  She had been making payments on the mortgage

herself until about 2000, using funds left to her by her deceased father and that were managed by a close family friend in Texas, Ted Stewart, much like an informal trust. Starting in 2000, arrangements were made so that Mr. Stewart would make the mortgage payments directly from the money he managed for Ms. Blanco and her deceased father.

After receiving the Notice to Vacate in September 2002, Ms. Blanco stated she contacted an attorney, Tom Stribling, who said he would take care of the matter once she sent over the paperwork, which she did. Yet, Ms. Blanco indicated at the suppression hearing that she did not actually *retain* the attorney to fight the eviction. Ms. Blanco also testified that a woman at the office of the attorneys who represented Matrix told her something could be worked out so Ms. Blanco would not have to vacate. Again, however, Ms. Blanco did not follow up on this conversation or devise a mutually agreed upon process for delaying or otherwise contesting the eviction.

Moreover, aside from documentation related to the civil eviction proceedings and in spite of her conversations from Mr. Stribling and someone from Matrix's counsel, Ms. Blanco was made aware that Matrix was continuing with the eviction only days before it took place. Roughly one week before December 19, 2002, Deputy Lucero arrived at 5612 Equestrian under the erroneous belief that the eviction was scheduled at that time. Upon nearing the home, he realized that the writ of assistance was to be served on a later date, but before leaving, was approached by Ms. Blanco outside the house. When Ms. Blanco asked if the officers needed assistance, Deputy Lucero informed Ms. Blanco that she was going to be served with papers the following week and that she needed to "move out" of the home.

Thus, even though Ms. Blanco was far more than an overnight guest at 5612 Equestrian Drive, having owned the residence for some seven years prior to the date of the events in question, she did not have an objectively reasonable expectation of privacy in the home on December 19, 2002.  She had been informed on more than one occasion that she was going to be evicted and did not engage in any communications or transactions with Matrix or its representatives that would have led a reasonable person to believe she had the right to continue to stay in the premises or that she had exclusive dominion and control over the home.  Stated otherwise, had Ms. Blanco taken other actions or been made other assurances by her counsel, by Matrix or its representatives, perhaps her subjective belief that she was entitled to remain in the home could be deemed objectively reasonable.  Contrary to the Government's position, Ms. Blanco expectation of privacy in the home was not rendered per se unreasonable by the eviction.

### B.      Plain View Search

The Court's inquiry into the constitutionality of the officers' actions on December 19, 2002 does not end here, however.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, *papers, and effects*, against unreasonable searches and seizures." U.S. CONST. amend. IV (emphasis added).  That is, the Amendment "protects two different interests of the citizen--the interest in retaining possession of property and the interest in maintaining personal privacy."  *Texas v. Brown*, 460 U.S. 730, 747 (1983) (Stevens, J., concurring); *see also Soldal v. Cook County, Ill.*, 506 U.S. 56, 63 (1992) (citing cases).  In the instant case, while Ms. Blanco may not have had a legitimate expectation of privacy in the home from which she was being evicted, she did retain a Fourth Amendment interest in her "personal effects" that were still in the home.  *See Owens*, 782 F.2d at 150-51 ("Even if [motel] had a legal

right forcibly to evict Owens in order to clear his room for the next occupants, neither it nor the police had any right to search his luggage or other closed containers.  Consequently, even if Owens did not retain a protected privacy interest in his room when the police entered, it certainly would have been reasonable for him to expect that the contents of closed containers he kept in his room would not be exposed to scrutiny by the police or motel personnel.").  Thus, while she may not raise a Fourth Amendment challenge to the officers' search of the house, she may object to any search or seizure of her personal property.

Indeed, the facts establish that after Deputies Amaro and Lucero had completed their protective sweep of the home, other law enforcement officers arrived on the scene and together with the two deputies, undertook a sequence of searches of Ms. Blanco's property.  In *Arizona v. Hicks*, 480 U.S. 321, 326 (1987), the Supreme Court made clear that a warrantless search of personal property will be found valid "if the 'plain view' doctrine would have sustained a seizure" of the property.  However, the Court cautioned that "'the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.'"  *Id.* at 328 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)).  This principle has formed the basis for numerous rulings in other cases.  *E.g., Michigan v. Clifford*, 464 U.S. 287 (1984); *Winters v. Bd. of County Comm'rs*, 4 F.3d 848 (10th Cir. 1993).  In the instant case, the warrantless searches of Ms. Blanco's personal property that were conducted after the protective sweep had terminated can be upheld only if the plain view doctrine would have justified a seizure of those items.

To determine whether seized evidence may be admitted pursuant to the plain view doctrine, the Court must conduct a three-part inquiry, as follows:

First, the seizing officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.  Second, the item must be in plain view and its incriminating character must be "immediately apparent."  In other words, upon viewing the object, the officer must at that moment have probable cause [footnote omitted] to believe the object to be contraband or evidence of illegal activity.  Finally, the officer must have a lawful right of access to the object.

*United States v. Tucker*, 305 F.3d 1193, 1202-03 (10th Cir. 2002) (quotations and citations omitted); *see also Winters*, 4 F.3d at 854 (citing inter alia *Horton v. California*, 496 U.S. 128, 136-37 (1990)).  In the instant case, all three of these requirements have been met.

### 1.    Lawfully on the premises

The presence of Deputies Lucero and Amaro in the house was authorized by the writ of assistance.  The Court finds unpersuasive Defendant's argument that the writ was facially invalid because it was served thirty-five days after issuance, in violation of both NMRA, Rule1-065's requirement that writs of assistance be served "forthwith" and Judge Baca's order that the writ be returned "within ten (10) days."  First, neither case law nor statute provide any definition of "forthwith."  Second, as the Government concedes, the ten-day return requirement points to the ambiguity of the writ itself since it does not indicate when that time period begins to run.  The Government suggests resolution of this ambiguity by looking to NMSA §§ 36-4-9 and 42-9-16.  Both provisions use the same time frame for return of executions issued by state district courts, indicating that executions "shall be returned within *sixty days from the date of the delivery thereof, to the sheriff or other officer*, or person whose duty it is or who may be designated to serve the same."  N.M. STAT. ANN. § 36-4-9.[6]  The Government urges reading the ten-day return

_____

[6]The complete text of § 36-4-9 is as follows:
 All the executions taken out of district courts shall be returned within sixty days from the date of the delivery thereof, to the sheriff or other officer, or person whose duty it is or who may be designated to serve the same; and such sheriff, or

requirement imposed by Judge Baca in conjunction with the sixty-day time frame described in these statutes.  Under the Government's view, the writ was validly executed sixty-five days after issuance because "the sheriff had sixty days from the date the writ was issued to serve the writ, and then ten days from the date of service to return the writ" to Judge Baca.  (Govt's Resp. at 5.)

The Court need not decide whether such an interpretation of the ten-day return requirement is accurate since, even assuming the writ was facially invalid, the *Leon* good faith exception protects the deputies' conduct in this case.  In *United States v. Leon*, 468 U.S. 879, 913 (1984), the Supreme Court held that the exclusionary rule should not be applied to "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate" when that warrant is subsequently found to have been invalid.  While the parties presently before the Court have pointed to no instance where the *Leon* good faith exception was applied to an administrative warrant or writs of the kind at issue here, the *Leon* decision did not turn on the type of warrant that had been issued.  In justifying the creation of a good faith exception, the *Leon* Court emphasized the following three points:

---

other officer or person, may offer for sale, and sell at public auction, at such time and place as may be designated, any real estate taken by virtue of such execution, complying with the provisions of the law, providing for appraisements, and by giving twenty days public notice of the time and place of the sale, in the manner provided by law. All personal property, taken by virtue of any execution, may be sold as provided by law. All executions may issue on application, and the service and return thereof shall be controlled by the plaintiff or his agent.

N.M. STAT. ANN. § 36-4-9.

Similarly, § 42-9-16, which is part of the Chapter entitled, "Actions and Proceedings related to Property," states, "All executions, writs of attachment and writs of replevin shall be returned within sixty days from the date of the delivery thereof to the sheriff or other officer or person whose duty it is, or who may be designated to serve the same." N.M. STAT. ANN. § 42-9-16.

First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates.  Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.  [footnote omitted]  Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

*Id.* at 916.

Thus, the *Leon* Court focused on *who* authorized the issuance of a warrant that is later found to have been infirm - namely, a detached and neutral magistrate.  This is precisely the person who issues a writ of assistance to help effectuate an eviction under New Mexico law.  That a different degree of evidence is required prior to issuance of a criminal search warrant and a writ of assistance does not make the rationale behind *Leon* inapposite to cases involving the latter for, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  *Id.* at 926.  While Deputies Lucero and Amaro did not obtain the writ of assistance in the first instance, the Court has been presented with no evidence indicating that they acted in any dishonest or reckless manner in serving it on Ms. Blanco.

### 2.     Immediately apparent criminal nature

As quoted above, the second prerequisite for application of the plain view doctrine - that the incriminating nature of the items be "immediately apparent" - involves asking whether the officers had probable cause to believe what they saw was contraband or evidence of criminal activity.  In *Tucker*, the Tenth Circuit explained the difference between probable cause and reasonable suspicion:

-17-

> While probable cause means "a fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation omitted); [*United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002)]. To determine whether the investigating officers had reasonable suspicion, [footnote omitted] we consider both the quantity of information possessed by law enforcement and its reliability. *See Alabama v. White*, 496 U.S. 325, 330 (1990). Both factors must be viewed under the totality of the circumstances. *See id.*

*Tucker*, 305 F.3d at 1200 (10th Cir. 2002).

In the instant case, Deputies Amaro and Lucero testified that the location of the motorcycle in the living room, the presence of two motorcycles, a surveillance system, and a large quantity of mid- to high-end electronics made them suspect the house stored stolen goods or other evidence of crime. While perhaps the location of the motorcycle inside the home or presence of numerous less expensive toys *alone* would not have been sufficient to support a finding of probable cause, looking at the totality of the circumstances, the Court finds that a reasonable, objective law enforcement official would have believed that there was a "fair probability" that the items in view were stolen or contraband. Deputy Amaro testified that he observed "lots of electronic equipment, remote controls," "quite a few" VCRs, "several Play Station/Game Box type games of the *same titles, that were still brand new in the wrappers that were just stacked*." (Trans. at 115, 116 (emphasis added).) It was not simply the sheer quantity of items that prompted the officers to grow suspicious, but the nature and appearance of these moderate to high-priced goods, plus the fact that the house was under the protection of a closed-circuit surveillance system. The electronic games observed by Deputy Amaro were new, unopened and of the same title.[7] The officers clearly had more than "a minimal level of objective

---

[7]Other witnesses testified to the existence of numerous other items also lying in the open. Robbie Sanchez described "piles and piles of electronic cars, and ... autographed helmets" lying in

justification" or "something more than an 'inchoate and unparticularized suspicion or hunch,'"

*United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994) (quoting *United States v. Place*, 462

U.S. 696, 706 (1983)).  As such, the Court finds the goods had an incriminating character that

was "immediately apparent" to the investigating officers, as is required for the plain view doctrine

to apply.

      **3.**      **Lawful right of access**

      The third condition necessary for application of the plain view doctrine is that the officer

have a lawful right of access to the objects in question. The electronics items and motorcycles

were not in closed containers or in other locations where the officers were not permitted to look

while conducting the protective sweep authorized by the writ.  Although the officers did not have

a lawful right of access to the firearms found in closed "containers" (drawers and a closed pistol

case), they would have been discovered inevitably when the officers executed their search warrant

later that evening.

<b>CONCLUSION</b>

      While Ms. Blanco may not have had a legitimate expectation of privacy in the house, she

certainly had a legally sufficient interest in her personal effects to challenge the warrantless,

nonconsensual search of her personal items as violative of the Fourth Amendment.  However, the

Court concludes that the search and seizure of evidence in this case was justified by the officers'

plain view observations.  The probable cause Deputies Amaro and Lucero developed during their

---

the living room and "a bunch of little Harley Davidson fixtures *still in the boxes*" in the dining
room.  (Trans. at 16.)  Although Mr. Sanchez also mentioned having seen computer components
in one room, photographs presented at the hearing suggested that these did not appear to be of
much value or otherwise suspicious because they appeared to be worthless items of junk
electronics.

protective sweep provided them with sufficient grounds for conducting a more intrusive search of Ms. Blanco's belongings and calling additional officers with specialized knowledge to aid in this investigation.

With probable cause to suspect stolen goods, Detective Bill Webb's moving of the cables on the motorcycles to observe their VINs was justified under the rule set forth in *Arizona v. Hicks*. The discovery of the attic stairs and methamphetamine laboratory in the crawl space stemmed directly from these actions since it was only after Webb informed Agent Chavez that Eddie Lando was one of the motorcycles' registered owners did Agent Chavez connect his informant's tip with this home.

Furthermore, Detective Webb was the first officer to discover the plastic dosage cup which he observed during his initial walk-through of the home. Additionally, Detective Webb noticed chemical staining on the walls and a chemical odor in the home consistent with what is found at locations where methamphetamine is manufactured.

Because the search warrant was prepared using observations made during and using information gleaned from these lawful searches, all evidence seized as a result of the warrant remains admissible.

**IT IS THEREFORE ORDERED** that Defendant Malinda Blanco's Motion to Suppress Evidence **[Doc. No. 20]** is hereby **DENIED**.

Dated this 5th day of February 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Bill Pflugrath

<u>Attorney for Defendant</u>:
Robert J. Gorence